# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WILLIAM CUNNINGHAM, Derivatively on Behalf of ASCENA RETAIL GROUP, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No.: ) ) |
| DAVID R. JAFFE, STEVEN L. KIRSHENBAUM, CARRIE W. TEFFNER, LINDA YACCARINO, KATIE J. BAYNE, KAY KRILL, MARC LASRY, STACEY RAUCH, KATE BUGGELN, CARL RUBIN, JOHN L. WELBORN, JR., ROBERT GIAMMATTEO, and GARY MUTO, | ) ) ) ) ) **DEMAND FOR JURY TRIAL** ) ) ) ) |
| Defendants, | ) ) |
| and, | ) ) |
| ASCENA RETAIL GROUP, INC., | ) ) |
| Nominal Defendant. | ) ) |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Ascena Retail Group, Inc. ("Ascena" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Ascena with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Ascena against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties and unjust enrichment that occurred between September 16, 2015 to the present (the "Relevant Period") and have caused substantial harm to Ascena.

## JURISDICTION AND VENUE

2.      Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is also proper as the Company's Bylaws provide:

**SECTION 6. EXCLUSIVE FORUM**. Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation arising pursuant to any provision of the Delaware General Corporation Law or the certificate of incorporation or these by-laws (as either may be amended from time to time), or (iv) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation governed by the internal affairs doctrine shall, in each case, be a state court located within the State of Delaware (or, if no state court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware).

## PARTIES

**A.      Plaintiff**

5.      ***Plaintiff William Cunningham*** is, and was at relevant times, a shareholder of Ascena.   Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.   Plaintiff is a citizen of the state of Pennsylvania.

**B.      Nominal Defendant**

6.      ***Nominal Defendant Ascena*** is a leading national specialty retailer of apparel for women and tween girls.  Ascena is a Delaware corporation.  Ascena is a citizen of the State of Delaware.

**C.      Director Defendants**

7.      ***Defendant David R. Jaffe*** ("Jaffe") is, and at all relevant times was, during the Relevant Period, Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors ("Board") of the Company.  Defendant Jaffe retired from his position as CEO and Chairman of the Board on May 1, 2019.  Defendant Jaffe remains a member of the Board of Directors.  The Company does not have a formal policy regarding the separation of its Chairman of the Board ("Chairman") and CEO positions.  Following Elliot S. Jaffe's retirement as Non-Executive Chairman, member of the Board and as an officer of the Company, on December 8, 2016, the Board appointed David Jaffe as Chairman.  Defendant Jaffe is a citizen of Connecticut.

8.      ***Defendant Steven L. Kirshenbaum*** ("Kirschenbaum") has served as a director of the Company since 2015.  Defendant Kirschenbaum is a citizen of New York.

9.      ***Defendant Carrie W. Teffner*** ("Teffner") has served a director of the Company since 2018.  Defendant Teffner is the Chair of the Audit Committee and a member of the Compensation Committee.  Defendant Teffner is a citizen of Arizona.

10.     **Defendant Linda Yaccarino** ("Yaccarino") has served a director of the Company since 2016.  Defendant Yaccarino is a member of the Leadership and Corporate Governance Committee and Compensation Committee.  Defendant Yaccarino is a citizen of New York.

11.     **Defendant Katie J. Bayne** ("Bayne") has served as a director of the Company since 2015.  Defendant Bayne is a member of the Leadership and Corporate Governance Committee.  Defendant Bayne is a citizen of Georgia.

12.     **Defendant Kay Krill** ("Krill") has served as a director of the Company since 2015.  Defendant Krill is a citizen of Connecticut.

13.     **Defendant Marc Lasry** ("Lasry") has served as a director of the Company since 2017.  Defendant Lasry is a citizen of Connecticut.

14.     **Defendant Stacey Rauch** ("Rauch") has served as a director of the Company since 2017.  Defendant Rauch is a member of the Audit Committee.  Defendant Rauch is a citizen of New Jersey.

15.     **Defendant Kate Buggeln** ("Buggeln") has served as a director of the Company since 2004.   Defendant Buggeln is the Chair of the Leadership and Corporate Governance Committee, and a member of the Audit Committee.  Defendant Buggeln is a citizen of Vermont.

16.     **Defendant Carl Rubin** ("Rubin") has served as a director of the Company since 2015.  Defendant Rubin is the Chair of the Compensation Committee.  Defendant Rubin is a citizen of Texas.

17.     **Defendant John L. Welborn, Jr.** ("Welborn") has served as a director of the Company since 2018.  Welborn serves as a Managing Director of Stadium Capital Management, LLC ("Stadium").  Stadium owns 19,231,162 shares of all the outstanding shares of Company stock or 9.74% of all the outstanding shares of Company stock.  Defendant Welborn is a citizen

4

of Connecticut.

18.     Defendants Jaffe, Muto, Kirshenbaum, Teffner, Yaccarino, Bayne, Krill, Lasry, Rauch, Buggeln, Rubin and Welborn are herein referred to as the "Director Defendants."

**Officer Defendants**

19.     ***Defendant Robert Giammatteo*** ("Giammatteo") is, and at all relevant times was, during the Relevant Period, Chief Financial Officer ("CFO") and Executive Vice President ("EVP") of Ascena.  Defendant Giammateo is a citizen of New York.

20.     ***Defendant Gary Muto*** ("Muto") serves as a director and the Company's CEO (since 2019) and served as the Company's President and CEO – Ascena brands from August 2017 to May 2019.  Defendant Muto is a citizen of Connecticut.

21.     The Director Defendants along with Defendants Giammatteo and Muto are herein referred to as the "Defendants."

### DUTIES OF DEFENDANTS

22.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Ascena, Defendants owed its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required Defendants to use their utmost abilities to control and manage Ascena in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of Ascena and its investors.

23.     Each director of the Company owes to Ascena and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful

information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

24.     To discharge their duties, the officers and directors of Ascena were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Ascena were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Ascena conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

25.      Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ascena, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## AUDIT COMMITTEE CHARTER

26.      It is the responsibility of the Audit Committee to assist the Board in its oversight of our financial accounting and reporting practices.  The duties of the Audit Committee include: (i) monitoring our financial reporting process and system of internal controls; (ii) selecting the Company's independent registered public accounting firm; (iii) monitoring the independence and performance of the Company's independent registered public accounting firm and internal auditing function; and (iv) providing an avenue of communication among the independent registered public accounting firm, management, the internal auditing functions and the Board. The Audit Committee has the authority to conduct any investigation appropriate to fulfilling its responsibilities, and it has direct access to the Company's independent registered public

accounting firm as well as our internal auditors. The Audit Committee has the ability to retain, at the Company's expense, special legal, accounting or other consultants or experts it deems necessary in the performance of its duties.

27.     The Audit Committee is charged with the following duties:

**IV.     Responsibilities, Authority and Duties**

**Documents/Reports Review**

1.     Review this Charter, at least annually, and report the results of its review to the Board.

2.     Review the Corporation's annual financial statements, including any certification, report or opinion rendered by the independent auditors.

3.     Review with financial management and the independent auditors' drafts of quarterly earnings press releases as well as financial information and earnings guidance or Quarterly Reports on Form 10-Q, including the Corporation's disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations, in substantially final form prior to release or filing. The Chair or one or more other members of the Committee may represent the entire Committee for purposes of this review.

4.     The Committee shall review internal control reports (or summaries thereof) and relevant reports rendered by the independent auditor (or summaries thereof).

*     *     *

**Financial Reporting Processes**

1.     Consult and hold timely discussion with the independent auditors concerning their review of the Corporation's financial reporting processes, including:

☐     All critical accounting policies and practices.

☐     All alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

☐    Other material written communications between the independent auditor and management, including, but not limited to, the management letter and schedule of unadjusted differences.

2.    Discuss with the Corporation's independent auditors their views about the quality of the Corporation's accounting principles as applied to its financial reporting.

3.    Consider, if appropriate, changes to the Corporation's auditing and accounting principles and practices as suggested by the independent auditors or management.

4.    Report to the Board such recommendations as the Committee deems appropriate including, whether the audited financial statements should be included in the Corporation's Annual Report on Form 10-K.

5.    Review and discuss with management any significant deficiencies or material weaknesses in internal control (whether identified by management or the independent auditor) and any fraud involving management or other employees who have a significant role in the Corporation's internal controls.

6.    Receive and review any disclosures from management made in connection with the certification of the Corporation's quarterly and annual reports filed with the SEC.

7.    The Committee shall review and approve the Related Party Transaction Policy, at least annually, and any and all related-party transactions.

8.    The Committee shall have the power to conduct or authorize investigations into any matters within the Committee's scope of responsibilities.

## Corporate Governance Guidelines

28.    The Board has adopted Corporate Governance Guidelines, a copy of which is posted on the "investors" page of the Company's website at www.ascenaretail.com, accessible through the "Investor Relations Menu." The Leadership and Corporate Governance Committee assists the Board in carrying out the Corporate Governance Guidelines, monitors the compliance by the Board and its committees with the Corporate Governance Guidelines, and, from time to

time as it deems appropriate, reviews and reassesses the adequacy of the Corporate Governance Guidelines and recommends any proposed revisions to the Corporate Governance Guidelines to the Board for approval.  The Corporate Governance Guidelines address topics such as (i) Board size, (ii) Board meetings and agendas, (iii) committees, (iv) Board leadership structure, (v) lead independent director, (vi) executive sessions of independent directors, (vii) director qualifications and attributes, (viii) director independence, (ix) director selection, (x) majority approval vote in uncontested director elections, (xi) director orientation, (xii) director access to officers and employees, (xiii) director responsibilities, (xiv) changes in directors' principal occupation, position or responsibility, (xv) outside directorships, (xvi) stockholder communications with the Board, (xvii) consideration of director candidates nominated by stockholders, (xviii) director compensation, (xix) restrictions on hedging and pledging transactions, (xx) annual evaluation of the Company's chief executive officer and succession planning, and (xxi) annual evaluation of the Board.

## <u>MATERIALLY FALSE AND MISLEADING STATEMENTS</u>

29.    On May 18, 2015, Defendants caused the Company to issue a press release reporting that it had entered into a definitive merger agreement with ANN Inc. ("ANN"), under which the Company will acquire ANN for a combination of cash and stock (the "ANN Acquisition").  ANN is the parent company of Ann Taylor and LOFT and as of January 31, 2015, operated 1,030 Ann Taylor, Ann Taylor Factory, LOFT Outlet and other stores in forty-seven (47) states, the District of Columbia, Puerto Rico and Canada.  Defendant Jaffe stated in pertinent part as follows:

> This powerful transaction joins two strong and highly complementary organizations and management teams and dramatically reinforces our leadership position in women's specialty apparel retailing.  We are excited to further leverage our uniquely capable operating platform and exceptional combined talent

to drive immediate, significant and ongoing value for our stockholders. With the addition of the Ann Taylor and LOFT brands, Ascena will become one of North America's largest and most diversified specialty apparel retailers, with a tremendous set of opportunities to continue to expand its leadership position in the women's apparel market.

30.     On August 21, 2015, Defendants caused the Company to issue a press release reporting that it completed the ANN Acquisition. Defendant Jaffe stated in pertinent part as follows:

This powerful merger joins two strong and highly complementary organizations, and dramatically reinforces our leadership position in women's specialty apparel, retailing. The acquisition positions Ascena as the third largest specialty apparel retailer and the single largest focused on women's apparel, with a diverse brand portfolio that serves women of all ages, sizes and demographics.

We expect to leverage Ascena's state-of-the-art distribution and fulfillment centers and its shared services capabilities to rapidly and comprehensively integrate the ANN INC. brands, and drive significant value to our stockholders. We have identified $150 million in annualized run rate synergies resulting from this transaction that we expect to capture by the end of the third-year post-closing.

31.     By the start of the Relevant Period, the ANN Acquisition was a complete disaster for the Company as ANN's operations were in far worse condition than had been represented to the public.  In order to mask the true condition of ANN, Defendants improperly delayed recognizing an impairment charge to the value of ANN's goodwill and, as a result, Ascena's reported income and assets were materially overstated and the Company's financial results were not prepared in conformity with Generally Accepted Accounting Principles ("GAAP").  In addition, many of the brands acquired in the ANN Acquisition were in steep decline and were also materially overvalued on Ascena's Relevant Period financial statements.  Throughout the Relevant Period, Defendants made statements that failed to disclose and misrepresented the adverse facts detailed herein.

32.     The Relevant Period commences on September 16, 2015.  On that date,

Defendants caused the Company to issue a press release reporting its financial results for its fiscal fourth quarter and full year ended July 25, 2015.  Defendant Jaffe stated as follows:

> We are executing against controllable factors, mindful that traffic continues to be challenging.  Our brands remain focused on strong merchandising execution, and disciplined inventory and expense management.  We are making good progress toward the multi-year development of our enterprise omni-channel platform, which is a key element of our long-term growth plan.  And with the acquisition of ANN INC., our shared services group is aggressively working to capture the $150 million of identified deal synergies.  We feel very good about the unique and scalable model we are creating, and believe **we are positioned well for the long term**.  (Emphasis added).

33.    On December 1, 2015, Defendants caused the Company to issue a press release reporting its financial results for its fiscal first quarter, the period ending October 24, 2015.  For the quarter, the Company reported a net loss of $0.10 per diluted share compared to net income of $0.32 per diluted share in the same period of fiscal 2015. According to the press release, the decrease was primarily due to the effect of purchase accounting adjustments and transaction costs related to the ANN Acquisition and adjusted earnings for the first quarter of Fiscal 2016 were $0.36 per diluted share compared to $0.33 per diluted share in the first quarter of fiscal 2015. Defendant Jaffe stated on the results as follows:

> On the operating front, we were pleased with first quarter earnings, which exceeded our expectations.  We saw strong sales performance at Maurices and Lane Bryant, and significant gross margin rate recovery at Justice, Ann Taylor and LOFT.  We continue to execute well against controllable factors, and believe we have compelling product and the appropriate level and mix of inventory to maximize our holiday opportunity.
>
> Specific to the Black Friday/Cyber Monday period, we saw mixed performance across our portfolio.  Importantly, we were very pleased with performance at Justice, which significantly exceeded our expectations during this critical peak period, delivering strong positive comp performance despite a reduced level of promotional activity.   As we discussed in detail at our investor day last month, the initial phase of our integration of ANN INC. is progressing well, along with each of the synergy workstreams.
>
> We are increasingly confident that the Justice turnaround is gaining traction, and

we're excited about the continuing improvement of Lane Bryant fundamentals, along with the sustained strength of Maurices performance. While Dressbarn had another challenging quarter, we continue to work to build the foundation for future growth.

34.     That same day, Defendants caused the Company to file a Form 10-Q with the

SEC for the quarter ended October 24, 2015, which was signed by Defendants Jaffe and

Giammatteo. The Form 10-Q described the ANN Acquisition stating as follows:

> On August 21, 2015, the Company acquired 100% of the outstanding common stock of ANN for an aggregate purchase price of approximately $2.1 billion. The purchase price consisted of approximately $1.75 billion in cash and the issuance of 31.2 million shares of the Company's common stock valued at approximately $345 million, based on the Company's stock price on the date of the acquisition. The cash portion of the purchase price was funded with borrowings under a $1.8 billion seven-year, variable-rate term loan described in Note 10. The acquisition is intended to diversify our portfolio of brands that serve the needs of women of different ages, sizes and demographics.

35.     In the Form 10-Q, for the ANN Acquisition, the Company attributed $953.2

million to Goodwill and $815 million to trade names.  With respect to the financial statements

contained therein, the Form 10-Q represented the following:

> These interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited. In the opinion of management, however, such condensed consolidated financial statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of operations, comprehensive (loss) income and cash flows of the Company for the interim periods presented.  In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with the accounting principles generally accepted in the U.S. ("US GAAP") have been condensed or omitted from this report as is permitted by the SEC's rules and regulations.  However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

36.     On March 1, 2016, Defendants caused the Company to file a Form 10-Q for the

period January 23, 2016, with the SEC which was signed by Defendants Jaffe and Giammatteo.

With respect to the Goodwill attributed to the ANN Acquisition, the Form 10-Q stated as

follows:

> The allocation of the purchase price to the assets acquired and liabilities assumed, including the amount allocated to goodwill, is subject to change within the measurement period (up to one year from the acquisition date) as additional information that existed at the date of the acquisition related to the values of assets acquired and liabilities assumed is obtained.  During the second quarter of Fiscal 2016, the Company recorded measurement-period adjustments which were not material to the condensed consolidated financial statements, as more fully described in the table below.  The Company is currently in the process of finalizing the allocation of the purchase price to the assets acquired and liabilities assumed and does not expect any changes to be material.

37.     The Form 10-Q stated that for the period from the date of acquisition through January 23, 2016, the Company reduced the Goodwill attributed to the ANN Acquisition by $4.9 million to $948.3 million.  With respect to the financial statements contained therein, the Form 10-Q represented the following:

> These interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited.  In the opinion of management, however, such condensed consolidated financial statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of operations, comprehensive (loss) income and cash flows of the Company for the interim periods presented. In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with the accounting principles generally accepted in the U.S. ("US GAAP") have been condensed or omitted from this report as is permitted by the SEC's rules and regulations.  However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

38.     That same day, the Company held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants spoke positively about the ANN Acquisition. In response to a question regarding ANN and Loft, Defendant Jaffe stated as follows:

> The businesses are performing very well.  We think the upside, forgetting all the synergies, all their cost savings, which we're on track on both counts, which is significant, we also see these businesses continuing to grow and perform at a higher level of productivity.  So, very optimistic about how these businesses are

trending and the potential for their continued growth.

* * *

What we've seen is that we've got strength across all of our brands, some more than others.   We have all these levers, not just on the top-line but through synergies, through a lot of the programs that we're running to cut costs, et cetera, that are going to enable us to hit our numbers, and while there may be a little bit of softness in one brand, invariably, we've been able to make it up if not more in other areas.

39.     On March 23, 2016, Defendants caused the Company to make a presentation at the Telsey Advisory Group Consumer Conference.   During the presentation, Defendant Giammatteo stated: "Ann Taylor and the Ann brands have done very, very well from a gross margin rate standpoint, so making progress there and, again, ***continuing to expect that growth forward***." (Emphasis added).   Defendant Giammatteo also positively spoke about the ANN Acquisition as follows:

Sure.   So last October, we laid out the long-term fiscal 2018 goal for the Company to be at $1 billion in EBITDA. And so I'll yet again reaffirm this year that we expect to deliver $0.75 to $0.80, which would translate to $670 million to $700 million in EBITDA. So, quick math, we have a $300 million gap to bridge there.

As I think about the $300 million, roughly 2/3 of it is what I would classify as self-help, so things that we own, such as you called it before the ANN deal synergies, the ANN stand-alone cost savings that they've been committed to before Ascena acquired them, and things like gross margin rate accretion across many of our brands.   And so thinking about that, we've got $235 million that we've committed specifically to deal synergies and the cost savings at Ann.   And those initiatives are all tracking at or ahead our expectations.   We have a high degree of visibility for the major supply chain initiatives which kick in in earnest in fiscal 2017 and fiscal 2018.

40.     On May 31, 2016, Defendants caused the Company to issue a press release reporting its earnings for the third fiscal quarter, the period ending April 23, 2016.   For the quarter, the Company reported earnings of $.08 per diluted share compared to $.15 per diluted share in the same period in fiscal 2015.   Defendant Jaffe commented on the results as follows:

At the same time, the environment this Spring has been challenging. After the disruption of a warm holiday season, we've had to contend with an unseasonably cold spring and resulting elevated traffic headwinds. While I think we have managed the business well, particularly with respect to inventory levels, we were not able to fully mitigate these challenges.  Our earnings exceeded the upper end of our guidance range for the third quarter, but I'll note that performance benefited from some favorable expense timing that offset softer than expected top-line performance. These expenses will come back in the fourth quarter and combined with the traffic challenges we've seen continue through May, we've adjusted our earnings outlook downward.

41.     That same day, the Company held a conference call with analysts and investors to discuss the Company earnings and operations. During the conference call, Defendant Jaffe positively described the ANN Acquisition as follows:

Our integration of ANN is progressing well, and we remain confident in our $235 million target for deal synergies and cost savings by the end of FY18.  *I'm especially pleased with the product-driven strength we have seen at LOFT, which was a bright spot in the quarter*.  [Emphasis added].

42.     During the conference Call, Defendant Giammatteo stated the Company was still on track to achieve their goal of $1 billion EBITDA by fiscal year 2018.  In response to an analyst's question about whether reaching this goal was "still in the cards," Defendant Giammatteo stated as follows:

So Susan, in terms of the performance, you asked about how we're looking at the forward year.  April and May looked a lot like each other.  So in terms of like how we're looking at the full year, we saw a very strong -- deep through April that continued into May until we got to Memorial Day when things have come back in line with expectations.  Really we're expecting again return to what we've seen before where traffic is in that negative low to mid-single-digit period for the fourth quarter where our brands, frankly, can navigate that with improved conversion and improved average dollar sale.

From a longer-term basis, we still believe in that $1 billion figure in FY18 that we talked about.  Certainly, this spring has been a bit challenged.  But again, you've got two-thirds of that path to the $1 billion, things that are fully under our control.  So things like -- that we've talked about before in terms of the synergies that remain in track. I'm sure we'll probably get some discussion on that in this call. Big component there, and we still feel good about that outlook. So certainly some headwinds here, but longer term, again, two-thirds of that path to the $1 are things

that are within our control.  Again, we need to see the comps a bit stronger than we
have here, but certainly we still think that $1 billion is in play.

43.     During the conference call, Defendant Jaffe spoke positively about the ANN

Acquisition.  The following exchange took place:

**Analyst**:

[I]t's been a year since you've announced the ANN acquisition.  Wanted to get
your take, what's really outperformed expectations thus far, what's performed to
plan, and then where do you see the most opportunity for improvement?
Presumably, it's the Ann Taylor division.  Just curious to get your take there.
Thanks very much.

**Defendant Jaffe**:

***Loft has really had a very, very strong season, very pleased with what they're
doing. So I would say they're above our expectation.***  ANN is pretty much in line
with our expectation, as is the ability to generate the synergies and the cost
savings that we've been talking about for about a year now.  That's coming in, as
Robb said, pretty much right on plan.  ***So I'd agree with your comment that ANN
is the area that we see the most upside for.*** (Emphasis added).

44.     On May 31, 2016, Defendants caused the Company to file a Form 10-Q with the

SEC for the quarter ending April 23, 2016, which was signed by Defendants Jaffe and

Giammatteo. In the Form 10-Q, the assessment on Goodwill relating to ANN as of April 23,

2016, was $948.2 million, a decrease from the prior quarter of $0.1 million, and a total decrease

of $5 million from the acquisition date.  With respect to the financial statements contained

therein, the Form 10-Q represented the following:

These interim condensed consolidated financial statements have been prepared
pursuant to the rules and regulations of the Securities and Exchange Commission
(the "SEC") and are unaudited.  In the opinion of management, however, such
condensed consolidated financial statements contain all normal and recurring
adjustments necessary to present fairly the condensed consolidated financial
condition, results of operations, comprehensive (loss) income and cash flows of
the Company for the interim periods presented. In addition, certain information
and footnote disclosures normally included in financial statements prepared in
accordance with the accounting principles generally accepted in the U.S. ("US

GAAP") have been condensed or omitted from this report as is permitted by the SEC's rules and regulations.  However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

45.     On June 15, 2016, the Company attended the Piper Jaffray Consumer Conference.

During the presentation, Defendant Jaffe spoke positively about the ANN Acquisition as follows:

> With this ANN acquisition, it tells about your cost savings, your synergies.  It tells us how faster you are going to pay back all the stuff that you've got.  So we're a little bit -- our model, our stock has got a little more hair on it.  But I think it's kind of fun of peel back the layers to understand the nuances of it, because I really do think over time, we have more levers and it's obviously on us to be able to execute and produce, but *we have more opportunities to be successful because of all the things I have mentioned; the strength of our brands, our backlog, our shared service model, the investments we're making*.  (Emphasis added).

46.     Defendant Giammatteo further stated as follows:

> [W]e feel very good about the synergies, *the ANN acquisition is going along wonderfully*. I couldn't imagine it being any better both from an execution and relationship side. So going really well there and I think there is a lot of things that we haven't yet cracked yet in terms of like the sourcing strategy that we have different models there, there is probably more opportunity there. (Emphasis added).

47.     The statements referenced above were materially false and misleading when made because they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them as follows:

(a)     that the ANN Acquisition was a complete disaster for the Company as ANN's operations were in far worse condition than had been represented to the public;

(b)     that, in order to mask the true condition of ANN, Defendants improperly delayed recognizing an impairment charge to the value of ANN's goodwill and, as a result, Ascena's reported income and assets were materially overstated and the Company's financial results were not prepared in conformity with GAAP;

(c)     that many of the brands acquired in the ANN Acquisition were in steep

decline and were also materially overvalued on Ascena's Relevant Period financial statements; and

        (d)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its operations and prospects.

48.     On September 19, 2016, Defendants caused the Company to issue a press release announcing its financial results for the year ending July 30, 2016.  Defendant Jaffe commented on the results stating, in pertinent part, as follows:

> Fiscal 2016 was a challenging year for Ascena characterized by a highly competitive selling environment and significant store traffic headwinds. While we are seeing good customer demand during peak periods, off-peak demand has been inconsistent, and fourth quarter financial performance fell well below our expectations.
>
> * * *
>
> Aside from the challenging business trend we've seen, ***I'd like to highlight progress in four key areas of our business that I believe lay the foundation for stronger future performance***.  First, we were pleased by the Justice turnaround.
>
> The Justice team delivered full-year operating margin in the middle of the guidance range we provided last September. ***Second, our integration of ANN continues to progress well, and we remain ahead of plan with our synergy and cost savings workstreams***. Third, the new Ascena omni-channel platform went live at Justice in the fourth quarter, and the early reads on demand growth have significantly exceeded our expectations. And finally, we continue to make progress with our enterprise transformation work, and we are currently moving forward to address identified opportunities.  (Emphasis added).

49.     On September 19, 2016, Defendants caused the Company to file a Form 10-K for the year ended July 30, 2016 with the SEC which was signed by Defendants Jaffe and Giammatteo. The Form 10-K reported Goodwill as it relates to ANN as of July 30, 2016, in the amount of $733.9 million, a reduction of $225.7 million.  According to the Form 10-K, the Company assigned this amount to other reporting units after they completed "an analysis of the expected synergies."  The Form 10-K stated as follows:

The Company allocated $225.7 million of the goodwill related to the ANN Acquisition to the Company's other reporting units where the anticipated benefits of the acquisition are expected to be achieved.

50.     With respect to Goodwill, the Form 10-K stated as follows:

The allocation of goodwill was based on specific identification or other reasonable allocation methodologies for expected cost savings related to procurement, fulfillment, distribution and shared services.   The amount of goodwill assigned to a reporting unit represents the difference between the fair value of that reporting unit before and after the acquisition using a with-and-without analysis that measures the fair values of the expected synergies under the income approach.

* * *

As discussed in Note 3, the Company performs its annual impairment assessment of goodwill and indefinite-lived intangible assets during the fourth quarter of each fiscal year. The impairment test for other indefinite-lived intangible assets consists of a comparison of the fair value of the intangible asset with its carrying value. If the carrying value of the indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized equal to the excess. ***Based on the results of the Company's annual impairment testing of goodwill and indefinite-lived intangible assets for Fiscal 2016, no impairment charges were deemed necessary***.

* * *

The allocation of the purchase price to the assets acquired and liabilities assumed, including the amount allocated to goodwill, was subject to change within the measurement period (up to one year from the acquisition date) as additional information that existed at the date of the acquisition related to the values of assets acquired and liabilities assumed is obtained.   During Fiscal 2016, the Company recorded certain measurement-period adjustments.   While no material adjustments are expected, the purchase price allocation is not yet final as the Company is completing its analysis of the opening balances related to deferred taxes.   The allocation will be finalized during the first quarter of Fiscal 2017. [Emphasis added].

51.     That same day, the Company held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants reduced earnings guidance for the Company and made other statements about the condition of the Company's business.

52.     In response to these announcements, which revealed that the ANN Acquisition was experiencing problems, the price of Ascena stock declined from $8.12 per share on September 19, 2016 to $5.69 per share on September 20, 2016 – a decline of 30% -- on extremely heavy trading volume.  Defendants, however, continued to conceal the full extent of the issues with ANN and did not write-down the value of ANN on Ascena's financial statements.

53.     On December 1, 2016, Defendants caused the Company to file a Form 10-Q with the SEC for the quarter ended October 29, 2016, which was signed by Defendants Jaffe and Giammatteo.  With respect to the goodwill attributed to the ANN Acquisition, the Form 10-Q stated "[t]here were no measurement-period adjustments recorded during the first quarter of Fiscal 2017 and the allocation of the purchase price is final" and the final goodwill allocation as of October 29, 2016, was $959.6 million and the final trade name allocation as of that date was $815 million. The Form 10-Q stated in pertinent part as follows:

> The impairment assessment of goodwill and other indefinite-lived intangible assets is performed at the level of each brand, which constitutes an individual reporting unit. During the fourth quarter of Fiscal 2016, the Company performed its annual impairment assessment (the "Fiscal 2016 Valuation"). As disclosed in our Fiscal 2016 10-K the Company had goodwill of $1,279.3 million, of which $733.9 million related to ANN, $169.4 million related to Justice, $126.0 million related to Lane Bryant, $200.7 million related to maurices and $49.3 million related to Catherines. While the results of that assessment indicated the fair values of Justice, maurices and Catherines all significantly exceeded their respective book values, the fair value of the Company's ANN and Lane Bryant reporting units exceeded their book value by less than 20% and are discussed in more detail below.
>
> In the Fiscal 2016 Valuation, the fair value of ANN exceeded its book value by 12% and the fair value of Lane Bryant exceeded its book value by 16%. For the three months ended October 29, 2016, both ANN and Lane Bryant have performed in line with the cash flow projections supporting the Fiscal 2016 Valuation as the shortfall in operating cash flows was offset by a decrease in capital expenditures.

54.     With respect to the financial statements contained therein, the Form 10-Q

represented the following:

> These interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited. In the opinion of management, however, such condensed consolidated financial statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of operations, comprehensive (loss) income and cash flows of the Company for the interim periods presented.  In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with the accounting principles generally accepted in the U.S. ("US GAAP") have been condensed or omitted from this report as is permitted by the SEC's rules and regulations.  However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

55.     On January 18, 2017, the Company held an investor day conference for analysts and investors.   During the conference, Defendants talked about the changing retail apparel industry environment and the pressure from Amazon and spoke positively about the Company's outlook and then present business condition.  Defendant Jaffe stated in pertinent part,

> [We]'ve got a lot of features that I think make us a really great investment. We're the largest specialty retail, are focused on women and girls.  We're got a really well diversified portfolio, revenue base and real estate footprint.  We've got a terrific shared service platform that we'll give you a little more detail on.  And we've got a lot of levers that are going to mitigate what's happening in the world and consumer behavior, and I think we've got very strong cash flow liquidity.
>
> * * *
>
> So we believe that our platform is an enabler of true synergies and cost-savings. We think our model enables to plug and play an acquisition. We merged with ANN about a year and a half ago. We have been able to get all those synergies that we thought we could relatively easily. That was our fourth acquisition, and the platform is pretty well-established so we were able to execute on that very well. And so we see our platform as both a differentiator and a competitive advantage for our business.

56.     Defendant Jaffe also provided an EBITDA outlook stating as follows:

> So back to our fiscal 2018 EBITDA outlook, with inclusion of the trend-based comp risk and the modest gross margin rate improvement we just discussed, we see a trend risk scenario of $580 million which represents low single digit growth from our current fiscal 2017 guide.

57.     On March 6, 2017, Defendants caused the Company to file its Form 10-Q for the period ending January 28, 2017 with the SEC which was signed by Defendants Jaffe and Giammatteo.   The Form 10-Q stated that "there were no measurement-period adjustments recorded during Fiscal 2017 and the allocation of the purchase price was finalized at the end of the first quarter of Fiscal 2017."   With respect to the financial statements contained therein, the Form 10-Q represented the following:

> These interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited.   In the opinion of management, however, such condensed consolidated financial statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of operations, comprehensive (loss) income and cash flows of the Company for the interim periods presented.   In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with the accounting principles generally accepted in the U.S. ("US GAAP") have been condensed or omitted from this report as is permitted by the SEC's rules and regulations.   However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

58.     The statements referenced above were materially false and misleading for the reasons set forth in ¶ 47.

59.     On May 17, 2017, Defendants caused the Company to issue a press release revising its third quarter and full year fiscal 2017 sales and earnings outlook as follows:

| Period | Comparable Sales | Non-GAAP EPS* |
|--------|------------------|---------------|
| Q3 FY17 | Down 8% | $0.04 - $0.06 |
| Full Year FY17 | Down 7% - Down 6% | $0.10 - $0.15 |

Defendant Jaffe stated: "The specialty retail sector is in a period of unprecedented secular change that is disruptive to traditional business models, and we believe operating conditions in our sector are likely to remain challenging for the next 12 to 24 months."   The press release also noted that the Company would be taking an impairment charge but failed to quantify the amount.

The press release stated as follows:

> The impact of the challenging retail environment, the decline in the Company's stock price, and the reduction in the Company's forecasted earnings represent impairment indicators which required the Company to test its goodwill and indefinite lived intangible assets for impairment during the third quarter. *The Company is in the process of completing that analysis and expects to record a material non-cash impairment charge of its goodwill and intangible assets during the third quarter; however, the amount of the charge is not able to be quantified at this time*. [Emphasis added].

60.     In response to this announcement, the price of the Company stock dropped from $2.82 per share to $2.06 per share, a decline of 26%, on extremely heavy trading volume.

61.     On June 8, 2017, Defendants caused the Company to issue a press release detailing its third quarter financial results.  The Company reported a GAAP loss of $5.29 per diluted share compared to net earnings of $.08 per diluted share in the year-ago period.  Further, comp sales were down 8% and non-GAAP EPS was $.05.  The press release further stated:

"*[T]he loss in the current quarter includes a non-cash pre-tax impairment charge of $1.324 billion* (after tax impact of $5.22 per diluted share) to write-down a portion of the Company's goodwill and other intangible assets.  (Emphasis added).

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

62.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and unjust enrichment by Defendants.

63.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

64.     Plaintiff is a current owner of Ascena stock and have continuously been an owner of Ascena stock during all times relevant to Defendants' illegal and wrongful course of conduct

24

alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

65.     During wrongful course of conduct at the Company, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

66.     The Ascena Board is currently comprised of Defendants Jaffe, Muto, Kirshenbaum, Teffner, Yaccarino, Bayne, Krill, Lasry, Rauch, Buggeln, Rubin and Welborn. Thus, Plaintiff is required to show that a majority of the Demand Defendants, *i.e.*, six (6), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

67.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

68.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

69.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate

this action because making a demand would be a futile and useless act.

70.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

71.     Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

72.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.

73.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Muto**

74.     Defendant Muto is not disinterested or independent, and therefore, is incapable of considering demand because Muto (as CEO of the Company) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Muto cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

75.     This lack of independence and financial benefits received by Defendant Muto renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

76.     In addition, Defendant Muto is a defendant in the securities class action entitled *Newman v. Ascena Retail Group, Inc., et al.*, Case No.: 2:19-cv-13529 (D.N.J.) ("Securities Class Action").

77.     As such, Defendant Muto cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

78.     Further, Defendant Muto has an employment letter with the Company dated June 1, 2017, and effective August 1, 2017.   The material terms of the employment letter are summarized below.

> Muto will receive an annual base salary of $1,000,000 and will be considered for an annual performance evaluation beginning in the fall of 2018.   Muto will continue to be eligible to participate in the Company's seasonal performance-based incentive compensation program and, beginning with the fiscal year 2018 fall season, will have an increased target level equal to 125% of annual base salary, with a maximum annual payout at two times the target level.

> Muto will continue to participate in the Company's Transformation Bonus Program (*see* "Compensation Discussion and Analysis – Transformation Bonus Opportunity" for additional details). In connection with his promotion, Muto will be eligible for a payout equal to an additional multiple of his August 1, 2017 base salary as follows: 0.25 for fiscal 2018; 0.3125 for fiscal 2019; 0.375 for fiscal 2020; and 0.4375 for fiscal 2021.

> Muto was entitled to receive an annual long-term incentive grant effective in or about September 2017 having an estimated total value of $2.5 million (the "2017 Annual Grant"). The 2017 Annual Grant may consist of stock options, RSUs, performance-based awards or such other incentives as determined by the Company. Awards that are not performance based vest in equal annual installments over a three-year period ("2017 Time-Based Awards"), and awards that are performance based ("2017 Performance-Based Awards") vest on the third anniversary of the grant date, subject to the achievement of the applicable

performance goals. Accordingly, in September 2017, Muto received: (i) a FY20 LTIP award with a grant date fair value of $1,075,000 subject to a 1-year net income goal and a 2-year post-performance vesting condition; (ii) a FY20LTIP award with a grant date fair value of $1,075,000 subject to a 3-year relative TSR goal; and (iii) an award of 360,825 options, which vests in equal installments on the first and second anniversaries of grant.

Muto received an additional one-time grant of 1,000,000 restricted stock units ("One-Time RSU Grant") in September 2017 that will vest 50% on June 30, 2019 and 50% on June 30, 2020.

The 2017 Annual Grant (*i.e.*, the 2017 Time-Based Awards and 2017 Performance-Based Awards) and the One-Time RSU Grant generally require continued employment through the vesting date, except that, prior to a change in control, if the Company terminates Muto's employment without "Cause" or Muto resigns for "Good Reason" (in each case, as defined in the employment letter), (i) the next tranche of any then outstanding unvested 2017 Time-Based Awards and One-Time RSU Grant scheduled to vest after such termination will vest on the date of such termination, and (ii) a pro-rata portion of any then outstanding unvested 2017 Performance-Based Awards will vest subject to actual achievement of the applicable performance goals determined after the end of the performance period.

All equity awarded to Muto is conditioned on his timely execution of a restrictive covenant agreement containing a one-year non-competition covenant and a two-year non-solicitation covenant in favor of the Company.

Effective August 24, 2017, Muto became a participant in the Company's Executive Severance Plan, subject to the terms and conditions of the ESP, but with certain modifications, including that his cash severance payment level relating to a non-change in control termination will be 24 months of base salary, and his cash severance level relating to a change in control related termination will be 24 months of base salary and bonus.

79.     This lack of independence and financial benefits received by Defendant Muto renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendant Jaffe**

80.     Defendant Jaffe is not disinterested or independent, and therefore, is incapable of considering demand because Jaffe is an employee of the Company who derives substantially all

of his income from his employment with the Company, making him not independent.  As such, Defendant Jaffe cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

81.     Effective August 1, 2017, the Company entered into an employment letter with Defendant Jaffe (the "Employment Letter").  The Employment Letter superseded and replaced the terms of the employment agreement dated March 5, 2014 previously in place between Jaffe and the Company.

82.     The Employment Letter provides for an annual salary of $1,000,000 per year or such higher salary as may be determined by the Company's Board or the Compensation Committee. The Employment Letter entitles Jaffe to participate in all the Company's retirement, insurance, and bonus, incentive and other benefit plans, including the Omnibus Incentive Plan, to the use of a car service at the Company's expense as necessary for him to perform his duties and responsibilities, including for transportation to and from his home.

83.     In the event that Jaffe's employment is terminated by the Company without cause or by Jaffe for good reason (a "Qualifying Termination"), other than upon, within the 90 days prior to, or during the 24 months following, in each case, a change in control, under the Employment Letter, Jaffe is entitled to receive, subject to his execution of a release, an amount equal to two times his base salary payable in installments for a period of 24 months following the date of termination.

84.     In the event that Jaffe incurred a Qualifying Termination upon, within the 90 days prior to, or during the 24 months following, in each case, a change in control, under the Employment Letter, Jaffe is entitled to receive, subject to his execution of a release, an amount

equal to two times the sum of his base salary and the greater of (a) annual target bonus for the year in which the change in control occurs; or (b) average three-year aggregate annual bonus equaling the sum of the two seasonal bonuses paid in each such fiscal year, payable in installments for a period of 24 months following the date of termination. In addition, upon such Qualifying Termination, any stock-based awards not vested immediately prior to the change in control that are outstanding on the change in control date (or outstanding immediately prior to the change in control date for awards not assumed or replaced by the successor) will be deemed vested on the termination date.  If the Qualifying Termination occurs during the 90-day period before the change in control, any unvested awards that expired on the date of the termination will be deemed vested and entitled to payment at fair market value.

85.     In the event that Jaffe incurred a Qualifying Termination (whether prior to, upon or during the 24 months following a change in control or in the absence of a change in control), under the Employment Letter, Jaffe and his covered dependents are entitled to receive, subject to his timely election of COBRA, continued participation in the Company's health and medical insurance plans at the active employee premium rate through the earlier of the period of Jaffe's and/or his covered dependents eligibility for COBRA and Jaffe becoming eligible under the health and medical insurance coverage of a subsequent employer.

86.     This lack of independence and financial benefits received by Defendant Jaffe renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendants Teffner, Buggeln, Rauch, and Rubin**

87.     Defendants Teffner, Buggeln, Rauch and Rubin are members of the Company's Audit Committee.

88.     Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*: "[r]eview[ing] and discuss[ing] with management any significant deficiencies or material weaknesses in internal control (whether identified by management or the independent auditor) and any fraud involving management or other employees who have a significant role in the Corporation's internal controls" and "[r]eceiving and review[ing] any disclosures from management made in connection with the certification of the Corporation's quarterly and annual reports filed with the SEC."

89.     Defendants Teffner, Buggeln, Rauch and Rubin, and during the times each served on this committee, breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  Therefore, Defendants Teffner, Buggeln, Rauch and Rubin face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendant Krill**

90.     Defendant Krill served as Chief Executive Officer of ANN, which was acquired by the Company in August 2015, from 2005 through October 31, 2015, and as President of ANN from 2004 through October 31, 2015.  Defendant Krill also served as a member of the board of directors of ANN from 2004 until the date that it was acquired by the Company.  From 2001 to 2004, Defendant Krill served as President of ANN's LOFT Division.  From 1998 to 2001, Defendant Krill was Executive Vice President, Merchandise and Design of ANN's LOFT Division. From 1996 to 1998, Defendant Krill served as Senior Vice President, General

Merchandise Manager of ANN's LOFT Division and, from 1994 to 1996, she was Vice President of Merchandising for Ann Taylor.

91.     Defendant Krill knew or was reckless in not knowing (as she was the CEO of ANN) that (a) ANN's operations were in far worse condition than had been represented to the public; (b) that, in order to mask the true condition of ANN, the Company improperly delayed recognizing an impairment charge to the value of ANN's goodwill and, as a result, Ascena's reported income and assets were materially overstated and the Company's financial results were not prepared in conformity with GAAP; and (c) that many of the brands acquired in the ANN Acquisition were in steep decline and were also materially overvalued on Ascena's Relevant Period financial statements.

**Defendant Wellborn**

92.     Defendant Wellborn serves as a Managing Director of Stadium.

93.     Stadium owns 19,231,162 shares of all the outstanding shares of Company stock or 9.74% of all the outstanding shares of Company stock.

## DAMAGE TO THE COMPANY

94.     Defendants' faithless acts and omissions, breaches of fiduciary duty and violations of the federal securities laws and state law have severely damaged, and will continue to damage, Ascena.  By engaging in the aforementioned unlawful scheme, Defendants: (i) caused Ascena to issue materially false and misleading statements to its shareholders and the investment community; (ii) caused Ascena common stock to trade at artificially inflated prices, exposing the Company to millions of dollars in potential civil, regulatory and criminal liability to investors and regulators, including the SEC; and (iii) exposed Ascena to tens of millions of dollars in legal and accounting fees to investigate this misconduct and to defend the Company in expensive to

defend regulatory investigations and shareholder litigation.

95.     Moreover, these actions, have irreparably damaged the Company's goodwill and reputation.  For at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## FIRST CAUSE OF ACTION
### (Against Defendants for Breach of Fiduciary Duties)

96.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

97.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

98.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

99.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to Ascena, Defendants failed to disclose that: (a) that the ANN Acquisition was a complete disaster for the Company as Ann's operations were in far worse condition than had been represented to the public; (b) that, in order to mask the true condition of Ann, Defendants improperly delayed recognizing an impairment charge to the value of Ann's goodwill and, as a result, Ascena's reported income and assets were materially overstated and the Company's financial results were not prepared in conformity with GAAP; (c) that many of the brands acquired in the ANN Acquisition were in steep decline and were also materially overvalued on Ascena's Class Period financial statements; and (d) as a

result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its operations and prospects.

100.    Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

101.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

102.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

<u>SECOND CAUSE OF ACTION</u>
<u>(Against Defendants for Unjust Enrichment)</u>

103.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

104.    As a result of the conduct described above, Defendants have been unjustly enriched at the expense of the Company.

105.    Defendants received millions of dollars in cash bonuses and equity incentive compensation by causing Ascena to issue materially false and misleading statements to the investment community that exposed it to millions of dollars in potential liability to investors and regulators.  Defendants should be required to disgorge the gains which he obtained and/or will otherwise unjustly obtain at the expense of the Company.  A constructive trust for the benefit of

the Company should be imposed thereon.

106.    All the stock sales proceeds and cash bonus and equity compensation payments provided to Defendants were at the expense of the Company.  The Company received no benefit from these stock sales proceeds and payments.  The Company was damaged by such stock sales proceeds and payments.

107.    Plaintiff, as a shareholder and representative of the Company, seeks restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, as a result of his wrongful conduct and fiduciary breaches.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: August 19, 2019

**O'KELLY ERNST & JOYCE, LLC**

*/s/ Ryan M. Ernst*

Ryan M. Ernst, Esq. (#4788)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Phone (302) 778-4000
Email: rernst@oelegal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com